IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


GREENWOOD LAND COMPANY,     )
               Plaintiff    )
                          )
     vs.                   )    Civil Action No. 09-686
                          )    Chief U.S. Magistrate Judge Amy Reynolds Hay
OMNICARE, INC.; NCS HEALTHCARE  )
OF NEW YORK, INC.,          )
              Defendant   )


MEMORANDUM OPINION

HAY, Chief Magistrate Judge

      The Court addresses here the pending, fully briefed Motion filed by Greenwood Land

Company ("Greenwood" or "the Plaintiff") (Doc. 7) seeking to disqualify counsel for

Defendants, Omnicare, Inc. ("Omnicare") and NCS Healthcare of New York, Inc. ("NCS").[1]

Counsel for the Plaintiff also seeks discovery to determine whether confidential information has

been communicated to the Defendants, and whether sanctions are appropriate.  The Court will

grant the Motion insofar as it seeks to disqualify Defendants' counsel, and will deny the request

for discovery.

I.  BACKGROUND

      The genesis of the pending Motion is described in a February 25, 2009 letter written by

attorney Gregory Pearson ("Pearson") of Buchanan Ingersoll & Rooney ("BI") to John H.

Williams ("Williams"), an attorney with Eckert, Seamans, Cherin & Mellott ("ES").  In that

---

[1]Because there are no discrepancies as to the underlying material facts involved in the motion for
disqualification of counsel, a hearing was unnecessary.

letter, Pearson stated that he had enclosed BI's original file on the Greenwood Land Company's

Lease.  He wrote that in 1998, Greenwood, as landlord, entered into a Lease with tenant, Thrift

Drug, Inc., but that some time afterward, the Lease was assigned to NCS.  Pearson continued:

> Subsequent to that time, it would appear that Omnicare, Inc.
> acquired the business or the assets of NCS.  In 2004, the Lease
> came up for renewal for a five year term, and no notice was given
> by the tenant to terminate at the end of the original term.  [BI was]
> involved in discussions with . . . the agent for Omnicare, who
> indicated that they would not go along with a five year extension of
> the Lease.  After some discussion, a proposal was made and a draft
> of that was sent [for]  . . . execution by Omnicare.  To the best of
> my knowledge, we never received any response to that proposal
> which would have formally recognized Omnicare as the tenant and
> extended the Lease for a period of approximately two years.

> Although it, to my knowledge, never executed the document or
> discussed it further with the principals of Greenwood, Omnicare
> continued to occupy the premises and pay an increased rent for a
> five year period.  We are now met with the situation where
> Omnicare says that it has provided timely notice of its intent to
> terminate at the end of the originally scheduled Lease, March 31,
> 2009.  Greenwood, however, never received that notice, and based
> on my online verification with the Post Office, it does not appear
> that there is any record of the Certified Receipt which Omnicare
> contends it sent.

> Hopefully, you can assist Greenwood in getting this resolved to
> their satisfaction.  If I can answer any more questions about the
> documents themselves, without providing any legal advice, given
> that we do have a conflict, I would be pleased to do so.

(Doc.7  Ex. Q).

ES filed suit on behalf of Greenwood on June 1, 2009.  The Complaint (Doc.1), which

named Omnicare as the Defendant, comprised three counts - the first for breach of the Lease, the

second for negligence based on failure to maintain and repair the leased premises, and the third

seeking punitive damages based on harm caused to the property.  Omnicare was served on June

4, 2009.

On or about the same date, Pearson and attorneys at ES exchanged emails concerning the conflict issues raised by ES.  In an email dated June 4, 2009, Pearson wrote to Gary Walker ("Walker") at ES, stating that he had reviewed what he believed to be the relevant Rules pertaining to conflicts, Rule 3.7 relating to Lawyers as Witnesses, as well as Rules 1.7 and 1.9, which are referenced in Rule 3.7.  Pearson stated, "After reviewing these, I do not see where there is a conflict that would prohibit [BI] from representing Omnicare. . . I wonder whether you would be good enough to send me . . . an email directing me to any specific provisions of the Rules or any case law that we may have failed to consider."  (Doc. 7 Ex. T).  Later that afternoon, Williams responded: "Without limiting our client in any manner, I would invite your attention to Rules 1.9(a) and 1.10(a), which I think largely cover it.  Having reviewed the BI file, I have great difficulty seeing how your firm could take a position adverse to Greenwood and represent Omnicare in this matter.  The overlap and symmetry in the cases could hardly be more pronounced."  (Id.  Ex. U).

On June 11, 2009, Greenwood filed an Amended Complaint (Doc. 3) adding NCS as a Defendant.  Communication between ES and BI regarding the alleged conflict of interest resumed on June 22, 2009, when attorney Stanley Parker ("Parker") of BI notified Williams that he intended to enter his appearance as counsel for Omnicare and NCS.  Parker also requested a thirty day extension of time in which to answer the Complaint.  Williams responded in an email which began, "To ensure that you have a base outline of these matters, I provide the following . . . ."  (Doc.7 Ex. X).  Williams then summarized prior dealings between Greenwood and Omnicare, noting that in 2004, the parties disputed whether the tenant had provided Greenwood with valid or effective notice of its intention to terminate.  (Id.).  That dispute also encompassed the identity of the tenant - i.e., was the tenant Omnicare or NCS, and whether either was bound

3

by the Lease terms.  According to Williams, during the course of representing Greenwood, BI obtained confidential communications from Greenwood and its representatives dealing with the facts of the case, its confidence in the strength of its case, and its "bottom line" position.  BI, in turn, provided Greenwood with advice regarding the terms of the Lease, and negotiated on Greenwood's behalf.  "The tenant(s) acquiesced, and returned to paying the rent under the Lease for the first of two 5 year renewal terms."  (Id.).  BI charged and was paid for this representation.

In the same email, Williams described for Parker similarities in the 2004 dispute and the current litigation writing: "The instant [2009] dispute is so similar to the dispute that arose five years ago, your firm provided its file to [ES] to aid [Greenwood] in this dispute."  (Id.).  Williams stated that he would consent to giving Omnicare and NCS an additional thirty days in which to file an Answer,

> conditioned upon the following terms: (1) Your client must find different counsel at a different firm, with whom you are prohibited from sharing substantive information about this case or the earlier substantially similar matter; (2) You must cease immediately any representation, counseling or services with regard to this matter other than to advise your client regarding conflict issues; (3) Your firm must represent that it has not provided substantive advice or counsel to any defendant or related entity or person, directly or indirectly, regarding the instant lawsuit or the matters underlying same.
>
> If you believe that I am wrong in these positions or my understanding of what transpired, I am willing to entertain any explanation you may have.  Otherwise, your client's choices appear to be filing your motion for an extension with the Court, finding other counsel, or filing a timely answer.

(Id.).  On June 23, 2009, Parker emailed Williams stating: "Based on the information that we have, this law firm does not believe there to be a conflict . . . ."  (Id.).  Later the same day, Parker filed his appearance on behalf of Omnicare and NCS (Doc. 4) and a Motion for Extension of Time

to File an Answer (Doc. 6).[2]  The pending Motion was filed on June 24, 2009.

II.  DISCUSSION

Before the Court turns to the law governing the Motion to Disqualify, it is important that it summarize information set out in the parties' submissions regarding issues confronted in 2004 and those underlying the merits of the present action.

A.  Scope of the 2004 Matter

It is undisputed that beginning in 1994, Greenwood, as landlord of commercial property located in Sharon, Pennsylvania, entered into a Lease with Thrift Drug, Inc.  At some point prior to 2004, that Lease was assigned to NCS.  The Lease, which covered a term ending on April 1, 2004, included two renewal periods which were to run from April 1, 2004 to April 1, 2009, and from April 1, 2009 to April 1, 2014.  The Lease renewals were automatic, meaning that the Lease continued in force as per the terms of the original agreement unless the tenant provided notice of intent not to renew at least six months prior to expiration of the then current term.  It is also undisputed that adequacy or absence of any termination notice given by NCS was at issue. Correspondence shows that:

> 1.  On October 1, 2003, Pearson wrote to Greenwood's property manager regarding his review of the Lease provisions.  (Doc.7 Ex. A);
>
> 2.  On February 9, 2004, Charlie Cricks ("Cricks"), a Greenwood principal, wrote to Pearson, stating that he had spoken with Omnicare's property managers regarding the Lease.  The unredacted phrases[3] in this communication include: "They offer no dispute

---

[2] While this Motion was pending, counsel for the Defendants filed a Motion to Dismiss Counts II and III of the Amended Complaint (Doc.19), to which the Plaintiff responded (Doc. 24).

[3] In order to protect what it considers to be confidential information, ES has provided the Court with redacted documents.  It has offered, however, to make the entire unaltered file as it was sent by

that;" "My thoughts are that;" "acceptable business strategy;" "you feel we have a position;" and the sentence, "I would like you to revisit the lease and let me know your thoughts." (Id. Ex. B);

3.  Two days later, Greenwood's property manager wrote to Pearson indicating that he had a "staff person currently preparing a table." (Id. Ex. C);

4.  Additional documents were forwarded to Pearson on February 16, 2004.  On March 2, 2004, Cricks wrote to Pearson stating, "Maybe.  Intuitively it seems like the right thing to do.  It seems to me . . .  What are your thoughts?" (Id. Ex. E);

5.  On March 4, Pearson posed a number of questions to Omnicare's property manager regarding the Lease.  He wanted to know the circumstances under which Omnicare purchased the assets of NCS, whether NCS continued to exist as a corporate entity, which legal entity occupied the leased premises, the period during which each was in possession, what intracorporate transactions had taken place within NCS and/or Omnicare relative to the Lease, and the nature of Omnicare's proposal with regard to its renewal.  (Id. Ex. F);

6.  Cricks emailed Pearson on April 1, 2004.  This email contains the phrases "I have just learned that Omnicare;" and "Our current strategy is."  Cricks asked for Pearson's thoughts.  (Id. Ex. G);

7.  Cricks emailed Pearson again on April 14, 2004, notifying him that he had heard from Omnicare's property manager that "the longest extension  that Omnicare would probably accept is a two year firm commitment at  the current terms.  I asked him about their attorneys' promise to contact you by mid-last week, and he said that will not happen soon . . .  Let me know your thoughts." On the bottom of the email, Pearson handwrote a notation: "[s]poke to Charlie.  Suggested . . .  Otherwise Charlie's partners . . . ." (Id. Ex. H);

8.  On May 3, 2004, Cricks notified Pearson that "Omnicare will not budge off of the 2 year lease.  Which according to them would be a new  lease, given that they are not acknowledging that they have accepted  assignment of our lease with NCS.  The sense from all of us is to . . .   How do we proceed?  I would rather not enter . . . ." (Id. Ex. I);

_____

Pearson available to the Court for in camera review.

6

9.  Pearson sent Cricks a copy of an "Assignment of Lease and Acknowledgment of Landlord." (Id. Ex. J);

10.  Pearson communicated with Omnicare regarding transfer of the Lease from NCS to Omnicare, and some of its proposed terms. (Id. Ex. K);

11.  Cricks requested that Pearson clarify Lease terms. (Id. Ex. L).

B.  Scope of the 2009 Matter

The remaining exhibits attached to the Plaintiff's Motion deal with recent events.  These documents show that in a letter to Greenwood dated February 6, 2009, the property manager for Omnicare made reference to a June 23, 2008 letter that had supposedly been sent to Greenwood via certified mail, return receipt requested.  The June letter was said to have contained Omnicare's notification to Greenwood that "the Tenant" intended to vacate the leased premises at the expiration of then current term, on March 31, 2009.  In the February letter, Omnicare asked Greenwood to contact it thirty to sixty days prior to the Lease's expiration to arrange a walk-through of the premises.  (Id. Ex. M).  Greenwood maintained that it had not received the June 23 notice, and, through its property manager, initiated an email exchange with Omnicare's property manager in an attempt to locate a copy of the letter and the return receipt.  (Id. Ex. N).  On February 20, Greenwood's property manager contacted Pearson to advise him of the notice issue. (Id. Ex. O).  Pearson promptly conducted an investigation with the Postal Service in an effort to document the sending and receipt of the June 23 letter.  He was unable to establish either, and so notified Greenwood.  Presumably in anticipation of further involvement in the matter, Pearson ran a conflicts check three days later, and learned that Omnicare was a BI client.  (Id. Ex. R.).  He notified ES of this conflict on February 25, 2009, asking that Walker assume representation of Greenwood.  (Id. Ex. Q).

7

With this background established, the Court turns to the law.

C.  The Law

A District Court has inherent power to supervise the professional conduct of attorneys practicing before it.  See In re Pittsburgh Corning Corp., 308 B.R. 716, 731 (W.D. Pa. 2004) (citing In re Corn Derivatives Antitrust Litig., 748 F.2d 157, 160 (3d Cir. 1984)). Thus, the Court may disqualify an attorney or a firm when it determines that a disciplinary rule has been transgressed.  See Unites States v. Miller, 624 F.2d 1198, 1201 (3d Cir. 1980).  In order to have opposing counsel disqualified, the moving party must make a clear showing that continued representation is impermissible.  See Cohen v. Oasin, 844 F.Supp. 1065, 1067 (E.D. Pa. 1994).

"Supervision of the professional conduct of attorneys practicing in a federal court is a matter of federal law."  Miller, 624 F.2d at 1200 (citing IBM v. Levin, 579 F.2d 271, 279 n.2 (3d Cir. 1978)).  The United States District Court for the Western District of Pennsylvania has explicitly adopted the Pennsylvania Rules of Professional Conduct setting standards for the ethical conduct of attorneys admitted to practice in the District.  See LR 83.3.1 (B).  These Rules provide the guide for the Court's consideration of the pending Motion.

In support of the Motion, counsel for the Plaintiff invokes first Pa.R.P.C. 1.9, which reads in pertinent part:

A lawyer who has formerly represented a client in a matter shall not thereafter:

(a)    represent another person in the same or a *substantially similar* matter in which that person's interests are materially adverse to the interests of the former client, unless the former client consents after full disclosure of the circumstances and consultations;

        . . . .

(c)    A lawyer who has formerly represented a client in a matter . . .

8

shall not thereafter:

    (1)    use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known.

(emphasis added). The comment to this Rule adds: "When a lawyer has been directly involved in a specific transaction, subsequent representation of other clients with materially adverse interests is clearly prohibited." Plaintiff's counsel also relies on Pa.R.P.C. 1.10 (a), which governs imputed disqualification: "While lawyers are associated in a firm, none of them shall knowingly represent a client while any one of them practicing alone would be prohibited from doing so."

The propriety of disqualification under Rule 1.9 - and, by extension, Rule 1.10 - turns on whether the 2004 matter, in which Pearson and BI represented Greenwood in a dispute with Omnicare and NCS is "substantially similar" to the present matter, in which Parker and BI represent NCS and Omnicare in a suit filed by Greenwood. In assessing whether matters are "substantially similar," courts have routinely considered the following three factors: 1) the nature and scope of the prior representation; 2) the nature and scope of the current representation; and 3) whether during the prior representation the client might have disclosed confidences to his attorney which could be relevant and detrimental to the client in the current action. See e.g., Com. Ins. Co. v. Graphix Hot Line, Inc., 808 F. Supp.1200, 1204 (E.D. Pa 1992); INA Underwriters Ins. Co. v. Nalibotsky, 594 F.Supp.1199, 1205 (E.D. Pa.1984) (citing Richardson v. Hamilton Int'l Corp., 469 F.2d 1382, 1385 (3d Cir.1972)). In assessing these factors:

    The court must weigh the objectives of Rule 1.9, which include maintaining the public's confidence in the bar, fulfilling the former client's expectations that attorneys will be loyal to their clients, and preventing the possibility that a client's secrets will be used against

9

him, against any countervailing policies such as permitting the
litigant to retain counsel of his choice.

In re Pittsburgh Corning Corp., 308 B.R. at 731.  "The question is not whether the attorney

actually acquired confidential information, but whether 'confidential information that may have

been gained in the first representation [may be] used to the detriment of the former client in the

subsequent action.'"  Javorski v. Nationwide Mut. Ins. Co., No 3:06-CV-1071, 2006 WL

3242112 at *6 (M. D. Pa. Nov. 6, 2006) (quoting Realco Services, Inc. v. Holt, 479 F. Supp 867,

871 (E.D. Pa. 1979)).  The Court in "Realco further stated that a lawyer 'might have acquired'

substantially related information if '(a) the lawyer and the client ought to have talked about

particular facts during the course of the representation, or (b) the information is of such a

character that it would not have been unusual for it to have been discussed between lawyer and

client during their relationship.'"  (Id.) (quoting Realco, 479 F. Supp. at 871-72).  See also Am.

Roller v. Budinger, 513 F.2d 982, 984 (3d Cir.1975) (stating that disqualification is appropriate

where an attorney representing an interest adverse to a former client "*might* have acquired

substantially related material") (emphasis added) (citations omitted); Jordan v. Phila. Hous.

Auth., 337 F. Supp.2d 666, 677 (E.D. Pa. 2004) (stating: "[T]he court should not attempt to

determine whether an attorney 'actually acquired confidential information,' but whether the

attorney might have acquired confidential information.") (quoting Realco, 479 F. Supp. at 871).

Motions to disqualify are generally disfavored, see Cohen, 844 F. Supp at 1067, but, at

the same time, any doubts which the court may have pertaining to the propriety of

disqualification should be resolved in favor of the moving party, thereby protecting the

confidences of the former client.  See INA Underwriters, 594 F. Supp. at 1207.

D.  Analysis

The Plaintiff contends that its submissions to the Court show that the 2004 and 2009 matters share "*obvious* common issues and factual matters" including substantial issues regarding which Defendant is the tenant under the Lease and strategies for making this determination, amounts for which Plaintiff would consider settling a dispute, and the value to the Plaintiff of having an obligated tenant over five years.  (Doc.15 Ex. A).  Counsel for Greenwood capsulizes its contention, stating that the 2004 matter included "communications between Mr Pearson . . . and Plaintiff Greenwood regarding a potential, upcoming dispute between the parties which had not yet come to fruition in 2003 and 2004, but which has become a focal issue in the present case." (Id. at 3).  In addition, ES argues that information made available to BI in connection with the 2004 matter is highly relevant to the present dispute.

Counsel for the Defendants responds that the 2004 and 2009 matters are distinct, and that no conflict is posed by its having represented Greenwood in the former, and NCS and Omnicare in the latter:

> The current action is a landlord-tenant dispute.  In contrast to the 2003-2004 dispute between the parties (in which NCS concededly had failed to give timely notice of intent to terminate the least but the parties ultimately focused on negotiations for an assignment and an amended lease), the current dispute involves an entirely different set of facts.  In addition to whether a certified notice was timely sent, this action involves a breach of the lease, including alleged physical damage to the leased premises as well as a separate "count" for punitive damages.

(Doc. 14 at ¶ 3).  As a correlate to its argument that the two matters are unconnected, BI contends that any confidential information that may have been disclosed by Greenwood in the prior matters is irrelevant to the current litigation.  (Doc.18 at 3).

The Court recognizes that there is not a precise identity of issues in the 2004 and the current matter.  Nonetheless, it is convinced that BI overstates the distinction between them. *The*

11

*common denominators in the two disputes are a single lease, issues relating to that lease, and the same parties.* Each matter involves the corporate identity of the tenant, construction of the Lease terms, the effect of failure to comply with these terms, and Greenwood's options in light of that failure. In assessing those options, Greenwood would certainly have shared its views with and sought advice from BI regarding construction of Lease terms, strategy related to enforcing the Lease, the possibility of renegotiation, the terms to which it would agree, with whom negotiations should take place, and information about how it valued available options. The present litigation is a natural extension of issues which arose in 2004, but did not have to be resolved because Omnicare elected to honor the Lease. Greenwood, one might say, saw the advantage in "letting sleeping dogs lie." Those "dogs" are again roused, and issues that were postponed now demand attention. Furthermore, there is at least some possibility that renegotiation of the Lease could take place, or that settlement discussions will occur. In either eventuality - and perhaps a range of others - information communicated to BI by Greenwood in 2004 could prove valuable to the Defendants in formulating their own position.

This is not the case posited in the comments to Rule 1.9 in which "a lawyer who recurrently handled a type of problem for a former client is . . . precluded from later representing another client in a factually distinct problem of that type even though the subsequent representation involves a position adverse to the client." Rule 1.9 comment 2. It is, instead, akin to the case where "the lawyer was so involved in the [prior] matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question." (Id.).

The Court's conclusion that disqualification is warranted is bolstered by the fact that Pearson recognized that BI's file on the prior matter would aid ES in handling the present matter. Even more significant is the fact that Pearson did not hesitate to respond to Greenwood's request

for help by undertaking an investigation on Greenwood's behalf at the inception of this litigation. His conduct underscores the relationship between the matters, demonstrating that Greenwood continued to look to him as its legal advisor, and that he readily responded in that capacity.

Although the Court is mindful of the importance of a party's right to choose his advocate, this is not a case where disqualification of BI will work an undue hardship on the Defendants. Without in any way impugning BI, the Court observes that nothing in the record suggests that there is a distinctive value to representation by a particular attorney or firm. This matter is, at its base, a fairly straightforward landlord-tenant dispute, which any number of knowledgeable and experienced attorneys are well equipped to handle.

Having balanced the factors relevant to a motion to disqualify based on Rule 1.9, the Court finds that the policies underlying that Rule are best served by granting Greenwood's Motion. An appropriate Order follows.

/s/ *Amy Reynolds Hay*
Chief United States Magistrate Judge

Dated:  20 August, 2009

cc:    All counsel of record by Notice of Electronic Filing